**Pericles PAPADOPOULOS, Plaintiff,**

v.

**The HARTFORD LIFE INSURANCE COMPANY, Defendant.**

**No. CIV.A. 03–12010NMG.**

United States District Court, D. Massachusetts.

July 19, 2005.

---

Donald J. Correa, Quinn & Correa, Plymouth, MA, for Pericles Papadopoulos, Plaintiff.

David B. Crevier, Crevier & Ryan LLP, Springfield, MA, for Hartford Life Insurance Companies, Defendant.

Theodore F. Glockner, Crevier & Ryan, LLP, Springfield, MA, for Hartford Life Insurance Companies, Defendant.

## MEMORANDUM & ORDER

GORTON, District Judge.

In the instant ERISA dispute, Pericles Papadopoulos ("Papadopoulos") alleges that his long term disability benefits were wrongfully terminated by the Hartford Life Insurance Company ("Hartford"). Papadopoulos now moves for leave to amend the complaint and both parties move for summary judgment.

## I. *Factual Background*

### A. The Plan

Fidelity Investments ("Fidelity") maintains a long term disability benefits plan ("the Plan") for its employees which is insured by Hartford. The Plan documentation states that Hartford is the administrator and that it:

> has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Groups Insurance Policy.

Under the Plan, a participant is entitled to benefits if he or she is "Totally Disabled", which is defined as follows:

> (a) during the Elimination Period; and
>
> (b) for the next 24 months, you are prevented by Disability from doing all the material and substantial duties of your own occupation on a full-time basis. After that, and for as long as you remain Totally Disabled, you are prevented by Disability from doing any occupation or work for which you are or could become qualified by training, education, or experience.

The "Elimination Period" is defined as "[t]he first 90 days of any one period of Total Disability". "Disability" is defined as "any accidental bodily injury, sickness or pregnancy".

Thus, the Plan establishes a two-period system. During the first period (90–day Elimination Period plus 24 months thereafter), to be eligible for coverage the claimant must be unable to perform *his own* occupation. After that, the claimant must be prevented, by Disability, "from doing any occupation or work for which [he is] or could become qualified by training, education, or experience" ("the Any Occupation Period"). Benefits cease on the earlier of the date that the relevant condition is no longer satisfied or "the date [the claimant] refuse[s] to be examined, if The Hartford requires an examination".

### B. Plaintiff's Claim for Benefits

Papadopoulos is a former employee of Fidelity where he worked as a software engineer and was a Plan participant. He stopped working on December 23, 1997, allegedly due to "cervical radiculopathy". On May 20, 1998, Papadopoulos submitted an application for long term benefits, claiming to be totally disabled by virtue of symptoms of "neck pains, migraines, dizziness, loss of balance, blurry vision, weak arms & legs, high blood pressure, other bodily pains".

The application prompted Hartford to gather the medical records of Papadopoulos's treating physicians, of which there were several. In 1995, Papadopoulos had come under the care of Dr. Albert Ackil ("Dr. Ackil"), a neurologist. Dr. Ackil diagnosed Papadopoulos with cervical radiculopathy and opined that he "should not do any heavy lifting, greater than 20 pounds, no prolonged sitting, standing, bending, climbing, [or] hyperextension of the neck." Dr. Ackil also restricted Papadopoulos from working at a computer and concluded that he was totally disabled.

Papadopoulos was also treated by Dr. Nicholas Tsanotelis ("Dr. Tsanotelis"), his primary care physician. On May 30, 2000,

Hartford wrote to Dr. Tsanontelis and asked him whether he believed that Papadopoulos could perform sedentary work. The doctor did not respond.

Gregory Perron ("Perron"), a chiropractor, treated Papadopoulos from August, 1997 to February, 1998. At the end of that treatment, Perron concluded that Papadopoulos had reached his "maximum medical improvement" and that Papadopoulos was capable of working an eight hour day and that he could "frequently carry up to 25 lbs".

On September 15, 1998, Hartford informed Papadopoulos that his claim had been approved. It concluded that Papadopoulos had become eligible for benefits on November 25, 1997 and that, as a result, the Any Occupation Period would begin on November 25, 1999.

### C. Hartford Terminates Benefits

In early 1999, Hartford initiated an investigation into whether Papadopoulos would be eligible for benefits during the upcoming Any Occupation Period. To that end, in August, 1999, Hartford hired Aragon Investigations, Inc. ("Aragon") to conduct surveillance of Papadopoulos to determine his physical limitations. The surveillance took place over several months. Ultimately, Aragon made a video of Papadopoulos which accompanies the instant motions. The video shows a man walking normally, carrying garbage to a dumpster, carrying a child, getting into a car and driving to various places.

Hartford also retained Dr. William Fishbaugh ("Dr. Fishbaugh") to conduct an independent medical evaluation and a Functional Capacities Evaluation of Papadopoulos. The Functional Capacities Evaluation never took place because Dr. Ackil refused to permit it, stating that Papadopoulos would be physically unable

to participate. On March 7, 2000, Dr. Fishbaugh examined Papadopoulos. He also reviewed the medical records of Papadopoulos's treating physicians. He concluded that Papadopoulos was totally disabled, "mainly because of his migraine headaches".

In late April, 2000, Hartford contacted plaintiff and his attorney to request an interview. In addition to making several telephone calls, Hartford sent Papadopoulos a letter explaining that, if he refused to be "examined", i.e. interviewed, his benefits could be terminated. On May 1, 2000, a Hartford representative visited Papadopoulos at his house but he refused to be interviewed.

On May 5, 2000, Hartford sent a copy of the surveillance video to Dr. Fishbaugh. After reviewing the tape, Dr. Fishbaugh changed his conclusion, stating that Papadopoulos is not totally disabled and "is capable of returning to work at 40 hours per week".

On July 21, 2000, Hartford terminated Papadopoulos's benefits. It sent him a letter stating that "sufficient medical documentation proving you are Totally Disabled from any occupation has not been received, and you have refused an examination". On August 30, 2000, Papadopoulos appealed the termination and wrote a letter to Hartford explaining that the Social Security Administration had conducted a three-year review and had approved him for benefits. He also speculated that the surveillance video might depict his twin brother.

In response, Hartford made several more attempts to arrange an interview with Papadopoulos but was unsuccessful. On December 20, 2000, Hartford sent plaintiff's file to Dr. George Kazda ("Dr. Kazda") for another review. Hartford requested that Dr. Kazda determine Papadopoulos's restrictions on activity and com-

ment as to whether those restrictions were consistent with the surveillance video. Dr. Kazda concluded that Papadopoulos could perform sedentary work as long as he could "change position frequently" and did not need to lift more than 50 lbs. He also concluded that the activities shown on the surveillance video were inconsistent with the restrictions put in place by Papadopoulos's treating physicians.

On January 29, 2001, Hartford denied Papadopoulos's appeal. It stated that its decision to deny coverage had been based upon 1) Dr. Fishbaugh's opinion, 2) Papadopoulos's refusals to be interviewed, 3) Dr. Kazda's opinion and 4) the surveillance tape.

### D. Overpayment of Benefits

While the Hartford's investigation was taking place, another controversy was brewing. The Plan provides for an offset to the monthly benefit payable to a claimant if the claimant receives "other income benefits". Under the Plan provisions, social security disability benefits are included as "other income benefits".

On May 13, 1999, Papadopoulos's former counsel wrote to Hartford to disclose that Papadopoulos had received a social security benefit of $12,298. On June 15, 1999, Hartford responded that it believed Papadopoulos had been overpaid by Hartford in the amount of $20,500. It is unclear from the record how that figure was calculated.

The parties negotiated and, on September 8, 1999, they entered into a "Reimbursement Agreement". In that Agreement, Papadopoulos stated as follows:

I, Pericles Papadopoulos am in agreement with The Hartford Life Insurance Company that I owe a total of $13,101.45 to the Hartford Life Insurance Company. The Hartford Life Insurance Company has agreed to withhold $585.77

from my monthly LTD benefits of $2,638.75 in lieu of requiring immediate reimbursement. Should my disability benefits end, for any reason, including, but not limited to: recovery from disability, obtaining employment, or death, I, Pericles Papadopoulos, or my beneficiary, or Estate agree to pay the remaining balance of the overpayment in full at that time.

On March 22, 2000, Hartford received notification that Papadopoulos had received an increase in his monthly social security benefit of Eight Dollars ($8). Accordingly, Hartford informed Papadopoulos that he owed an additional $140 in connection with the overpayment.

Between the date of execution of the Agreement and the termination of benefits, the overpayment was reduced to $6,798. That amount has not been repaid but Papadopoulos contends that he need not pay it because the Reimbursement Agreement was "nullified".

### E. Procedural History

Papadopoulos filed the instant action on October 16, 2003, stating a claim for wrongful termination of benefits under ERISA. On March 30, 2004, the complaint was amended to include a claim for breach of fiduciary duty but two weeks later that claim was voluntarily dismissed without prejudice.

On April 29, 2004, Hartford filed and answer and counterclaimed for equitable restitution of the $6,798 pursuant to 29 U.S.C. § 1132(a)(3) (Counterclaim I) and for breach of contract (Counterclaim II). On November 29, 2004, Hartford moved for summary judgment on plaintiff's claim and its counterclaims.

On December 2, 2004, plaintiff moved for summary judgment and to "supplement the record for judicial review", by seeking to file with the Court documents which were not considered by Hartford in reaching its decision. On December 13, 2004, plaintiff filed a motion for leave to amend the complaint, seeking to reassert its claim for breach of fiduciary duty.

### III. *The Motions for Summary Judgment*

#### A. Summary Judgment Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991)(quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993). If, after viewing the record in the non-

moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.

## B. Standard of Review

█ A district court reviews ERISA claims arising under 29 U.S.C. § 1132 *de novo* unless the benefits plan in question confers discretionary authority upon the administrator to "determine eligibility for benefits or to construe the terms of the plan". *Bekiroglu v. Paul Revere Life Ins. Co.*, 223 F.Supp.2d 361, 366 (D.Mass.2002), *aff'd* 75 Fed.Appx. 8 (1st Cir.2003). If the plan clearly gives such authority to an administrator, then the administrator's decisions are subject to deference and will only be reversed if they were "arbitrary, capricious or an abuse of discretion" ("the arbitrary and capricious standard"). *Diaz v. Seafarers Int'l Union*, 13 F.3d 454, 456 (1st Cir.1994).

█ In this case, the Plan explicitly confers discretionary authority upon Hartford and, thus, the arbitrary and capricious standard is presumptively applicable. *Id.* Notwithstanding that rule, plaintiff makes two arguments as to why *de novo* review is appropriate: the defendant acted in "bad faith" and the decision on appeal was not rendered within 120 days.

█ With respect to the first argument, Plaintiff misconstrues governing law. There is no exception to the arbitrary and capricious standard for bad faith. Rather, evidence of bad faith is evidence that the administrator's decision was arbitrary and capricious. Plaintiff fails to cite First Circuit authority to suggest otherwise. Moreover, the cases from other circuits that he cites do not support his contention because the courts in those cases, although discussing the role of bad faith, applied the arbitrary and capricious standard. *See, e.g., Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1049–50 (7th Cir.1987).

█ Plaintiff also argues that *de novo* review is appropriate because Hartford took approximately 145 days to decide the appeal, i.e. more than the 120–day maximum permitted under ERISA.[1] Plaintiff cites *Jebian v. Hewlett–Packard Company*, 349 F.3d 1098 (9th Cir.2003) for the proposition that a reviewing court may apply a *de novo* standard of review if an appeal is not decided within 120 days.

█ Plaintiff's argument fails for two reasons: 1) the Court in *Jebian* expressly limited its holding by excluding "inconsequential violations of the deadlines" from the rule it established, *id.* at 1107, and 2) more importantly, *Jebian* is not the law of the First Circuit. Rather, in this Circuit, "[s]ubstantial compliance with the regulations is sufficient." *Terry v. Bayer Corp.*, 145 F.3d 28, 39 (1st Cir.1998).

Hartford was delinquent in rendering its decision but that ERISA violation was inconsequential. On July 21, 2000, Hartford wrote to plaintiff and explained that his benefits were being terminated based, in part, upon the videotape. On September 7, 2000, Hartford received a letter from Papadopoulos initiating his appeal and raising the possibility that the video might depict his twin brother. Hartford then made repeated attempts to schedule an interview with Papadopoulos in order to identify the individual in the video. In December, 2000, having received no response from Papadopoulos, Hartford initi-

---

1. The parties disagree as to the exact number of days that Hartford took to decide the appeal but the disagreement is immaterial.

ated another independent medical evaluation and informed Papadopoulos of its pendency by mail. Within one week of the completion of the evaluation, the appeal was decided.

Under the terms of the Plan, plaintiff was obligated to undergo an "examination" at Hartford's request. Had he done so, the instant controversy likely could have been avoided. Because he did not, the delay, which resulted from the investigation that Hartford felt compelled to undertake once plaintiff had declined to cooperate, is partially attributable to him. Under the circumstances, Hartford acted with appropriate diligence and the standard of review is unaffected. Accordingly, the arbitrary and capricious standard is applicable.[2]

■ Under the governing standard, a "decision will be upheld if it was within [the administrator's] authority, reasoned, and supported by substantial evidence in the record." *Doyle v. Paul Revere Life Ins. Co.,* 144 F.3d 181, 184 (1st Cir.1998) (internal citations omitted). Substantial evidence is evidence "reasonably sufficient to support a conclusion". *Sullivan v. Raytheon Co.,* 262 F.3d 41, 51 (1st Cir.2001).

■ In reviewing a decision to terminate benefits under ERISA in the context of a motion for summary judgment, "the district court must ask whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." *Landman v. Paul Revere Life Ins. Co.,* 337 F.Supp.2d 283, 294 (D.Mass.2004). If, even when viewed in a light most hospitable to the non-moving party, the plan administrator's decision was reasonable, it will not be disturbed. *See Colby v. Unumprovident,* 328 F.Supp.2d 186, 190 (D.Mass.2004).

## C. Record on Review

■ There is a "strong presumption that the record on review is limited to the record before the administrator." *Lopes v. Metropolitan Life Ins. Co.,* 332 F.3d 1, 5 (1st Cir.2003). *See also Kolling v. Am. Power Conversion Corp.,* 347 F.3d 11, 14 n. 6 (1st Cir.2003); *Liston v. Unum Corp. Officer Severance Plan,* 330 F.3d 19, 23 (1st Cir.2003)("The ordinary rule is that review for arbitrariness is on the record made before the entity being reviewed."). As the First Circuit Court of Appeals asks, rhetorically, "How could an administrator act unreasonably by ignoring information never presented to it?" *Liston,* 330 F.3d at 23.

■ Papadopoulos moves to add 16 documents to the record for judicial review and states, without explanation, that they are "critical to a full and fair review". As Hartford points out, however, five of the documents are already contained in the record and the remainder were not in Hartford's possession during its review process. In fact, most of them did not yet exist.

Plaintiff has not overcome the presumption in favor of limiting the record on review to those documents which were before Hartford at the time. That is so because he has not explained why those documents should be considered now or how they could possibly demonstrate that Hartford's decision was arbitrary and capricious, given that Hartford could not

---

**2.** Plaintiff's Motion to Determine the Appropriate Judicial Standard of Review will, therefore, be denied as moot.

have considered them. Accordingly, plaintiff's motion to supplement will be denied.

### D. Hartford's Decision to Terminate Coverage

█ Hartford contends that it is entitled to summary judgment because, given the substantial evidence in support of its decision to terminate benefits, its decision was, necessarily, not arbitrary or capricious. Papadopoulos moves for summary judgment and makes precisely the opposite contention. Because plaintiff's coverage was terminated during the Any Occupation Period, the relevant inquiry is whether he was "prevented by Disability from doing any occupation or work for which [he is] or could become qualified by training, education, or experience". More specifically, the issue is whether Hartford's conclusion that Papadopoulos could perform such work was arbitrary and capricious.

Hartford has stated that its decision was based upon 1) Dr. Fishbaugh's opinion, 2) Papadopoulos's refusals to be interviewed, 3) Dr. Kazda's opinion and 4) the surveillance tape. Rather than discussing that evidence, Plaintiff devotes his opposition to arguing that Hartford acted in "bad faith".

Plaintiff contends, specifically, that Hartford acted in bad faith with respect to Dr. Fishbaugh because it allegedly "concealed" the doctor's initial report from plaintiff while it "convinced" Dr. Fishbaugh to change his opinion. Plaintiff also accuses Hartford of bad faith because it scheduled Papadopoulos for a Functional Capacity Evaluation and because it referred plaintiff's case to the Insurance Fraud Bureau of Massachusetts ("the IFB") for investigation of potential insurance fraud. Finally, it appears that plaintiff accuses Hartford of bad faith for opposing plaintiff's motion for leave to amend the complaint because it knew it would be difficult for plaintiff's counsel to review the 1,800 page record.

Much of plaintiff's argument is irrelevant. His allegations do not suggest bad faith and, in any event, are largely unrelated to Hartford's decision to terminate benefits. The cancellation of the Functional Capacity Evaluation was not cited by Hartford as a reason for terminating coverage and there is no evidence that it was, in fact, considered. Likewise, it is unclear how Hartford's referral to the IFB (which is encouraged of insurance companies suspecting fraud) is relevant to the legitimacy of its decision to terminate coverage. Finally, the argument that defense counsel's decision to oppose plaintiff's motion for leave to amend could amount to bad faith is untenable and without merit.

Plaintiff's only argument addressed to the evidence relied upon by Hartford is its contention that Hartford coerced Dr. Fishbaugh into changing his conclusion. The evidence does not, however, support plaintiff's position. His allegation that Hartford "concealed" the doctor's initial report is severely undercut by the fact that the record is in plaintiff's possession and is part of the judicial record. Moreover, plaintiff provides no evidence, just speculation, that Hartford improperly influenced Dr. Fishbaugh's conclusion. To the contrary, the evidence shows that the doctor changed his conclusion because he was provided with new evidence, the videotape. Hartford's intervention (the mailing of the videotape) did, indeed, cause Dr. Fishbaugh to change his conclusion, but not for any illegitimate reason. Accordingly, there is no evidence that Hartford acted in bad faith.

Although plaintiff has declined to address the substantiality of the evidence relied upon by Hartford, this Court will do so nonetheless.

### 1. *Medical Evidence*

Hartford relied, in part, upon the opinions of Dr. Fishbaugh and Dr. Kazda that plaintiff was not totally disabled and that he could perform sedentary work. Both doctors reviewed plaintiff's medical records and the videotape, and Dr. Fishbaugh examined the plaintiff. There is no evidence that they were biased or that their conclusions were inaccurate. Accordingly, it was legitimate for Hartford to accord weight to their conclusions.

 Plaintiff's treating physicians offered opinions which conflicted with those of Drs. Fishbaugh and Kazda. Those opinions are also presumptively valid. Thus, the medical evidence consists of credible, but differing, accounts of the plaintiff's condition by trained doctors. Faced with conflicting evidence, especially where that evidence relates to medical conditions, the Court defers to the plan administrator's resolution. *Leahy v. Raytheon Co.*, 315 F.3d 11, 19 (1st Cir. 2002)("when the medical evidence is sharply conflicted, the deference due to the plan administrator's determination may be especially great"). The fact that the plan administrator chose to resolve the conflict against the treating physicians is of no consequence. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) ("courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician"). Accordingly, the medical evidence lends substantial support to Hartford's decision.

### 2. *Plaintiff's Refusal to be Interviewed*

In terminating coverage, Hartford also relied upon plaintiff's refusal to be interviewed. The Plan explicitly states that benefits are to be terminated upon "the date [the claimant] refuse[s] to be examined, if The Hartford requires an examina-tion". Plaintiff was warned that a refusal to be interviewed could result in termination of his benefits, yet his refusal persisted. Given the quoted Plan language, the refusal, taken alone, would have potentially provided sufficient grounds for termination. At the very least, it suggests that plaintiff was not forthright about his condition. Either way, plaintiff's refusal to be interviewed is further evidence in support of Hartford's decision.

### 3. *The Videotape*

Finally, Hartford relied upon the videotape which, as found by two doctors, suggests that Papadopoulos could perform a range of daily activities, could engage in sedentary work and was not totally disabled. As such, it lends considerable credence to Hartford's decision to terminate benefits. Rather than disputing that conclusion, plaintiff suggests that the videotape might depict his twin brother and not him.

Hartford concluded, after investigation, that the individual in the videotape was the plaintiff and that conclusion was sound for two reasons. First, as Hartford points out, the video depicts a man walking from *plaintiff's* home, driving *plaintiff's* car and carrying *plaintiff's* trash. There is no indication of involvement by his brother.

Second, Hartford repeatedly sought to interview plaintiff to resolve conclusively the identity of the person in the videotape. After declining that opportunity, plaintiff cannot now benefit from the ambiguity he created by speculating that the video "could" depict his brother. The most reasonable explanation for plaintiff's refusal, and his present failure to present evidence to the Court concerning the videotape, is that he prefers to maintain the ability to deny plausibly that it depicted him. As a result, Hartford was reasonable in con-

cluding that the videotape depicted plaintiff.

In light of the cited evidence, Hartford's decision to terminate benefits was not arbitrary, capricious or an abuse of discretion under any reasonable interpretation of the evidence. Therefore, defendant's motion for summary judgment will be allowed with respect to Count I and plaintiff's motion for summary judgment will be denied.[3]

### E. Hartford's Counterclaims

■ Hartford also moves for summary judgment with respect to its counterclaims for breach of contract and equitable reimbursement, both of which relate to the overpayment of benefits which resulted when plaintiff obtained a social security award.

#### 1. *Breach of Contract*

The breach of contract claim is based upon the Reimbursement Agreement. In that Agreement, plaintiff stated that he owed money to Hartford and agreed to repay it on a schedule. The Agreement provided that, if plaintiff's benefits "ended", the outstanding sum would be due immediately. Plaintiff's benefits were terminated and he concedes that he has not paid the outstanding sum. Accordingly, on the undisputed facts, Hartford makes a straightforward case for breach of contract.

Papadopoulos makes two arguments in response. First, he argues that the Agreement was not supported by consideration. It is unclear which party he believes did not receive consideration but, either way, his argument is without merit. Before the agreement was executed, Hartford had the right to require immediate repayment of the entire overpayment. Pa-

padopoulos benefited from the agreement by Hartford to relinquish that right. Hartford, in turn, acquired a structured settlement which enabled it to reduce its monthly payments to Papadopoulos to ensure that it would recoup the money due without the need for litigation.

■ Second, Papadopoulos argues that, by terminating his benefits, Hartford "nullified" the Reimbursement Agreement. In other words, he contends that Hartford could not both terminate benefits and declare the outstanding sum due. His argument is flawed because the Agreement explicitly contemplates such a scenario. It states:

> [s]hould my disability benefits end, for any reason, including, but not limited to: *recovery from disability*, obtaining employment, or death, I, Pericles Papadopoulos, or my beneficiary, or Estate agree to pay the remaining balance of the overpayment in full at that time.

(emphasis supplied). Papadopoulos's benefits were terminated because Hartford found that there had been a "recovery from disability". As discussed above, that conclusion was sound. Under the agreement, there was only one way the benefits could have been terminated from a "recovery from disability": by Hartford conducting an investigation and so concluding. Thus, the agreement contemplated that Hartford could both terminate benefits and declare the entire sum due and the Agreement was not "nullified" by that occurrence. Plaintiff is in breach of the Agreement for failing to pay the outstanding sum and defendant's motion for summary judgment will be allowed with respect to its counterclaim for breach of contract.

---

**3.** Oral argument is unnecessary and plaintiff's · motion for such argument will be denied.

### 2. *Equitable Restitution*

As an alternative to damages for breach of contract, Hartford seeks equitable restitution of the overpaid funds. 29 U.S.C. § 1132(a)(3) provides that an aggrieved party may seek equitable relief under ERISA. There is, however, no entitlement to relief at law. *See* 29 U.S.C. § 1132(a)(3). Thus, Hartford's claim depends upon the common law distinction between law and equity. *See Great–West Life & Annuity Insurance Company v. Knudson,* 534 U.S. 204, 213, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002).

A claim for restitution can be either legal or equitable. *Id.* Restitution is equitable in cases "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession". *Id.* It is a remedy at law if the plaintiff seeks to impose personal liability upon the defendant. *Id.*

In this case, Hartford seeks a constructive trust upon the specific funds that it overpaid. Thus, its claim is for equitable restitution. Hartford has not, however, attempted to trace the overpayments to any specific funds in Papadopoulos's possession. As a result, genuine issues of material fact remain as to whether the overpaid funds are still possessed by Papadopoulos and, if so, in which "particular funds or property" they reside. Moreover, if a constructive trust were imposed, it would be imposed based upon the actual amount of the overpayment, not the outstanding $6,798 because that figure is the result of the parties' negotiations and is not necessarily an accurate representation of the funds which belong to plaintiff "in good conscience". There is an issue of fact as to that amount.

Hartford seeks to remedy those evidentiary shortcomings by requesting that, in the alternative, the Court order an accounting so that the overpayment funds may be traced. In light of the fact that Hartford has a fully-compensatory remedy at law, i.e. a breach of contract claim, the Court declines to enlarge the case. Accordingly, Hartford is not entitled to summary judgment on its counterclaim for equitable restitution.

### IV. *Plaintiff's Motion for Leave to Amend*

Plaintiff moves for leave to amend the complaint to reassert a claim for breach of fiduciary duty against Hartford. Hartford responds with two arguments in opposition: 1) allowing the amendment would be unduly prejudicial at this stage of litigation and 2) the amendment would be futile · as a matter of law because claims under 29 U.S.C. § 1132(a)(1) (Count I of the complaint) cannot co-exist with claims under § 1132(a)(3) (which Hartford presumes to be the statutory basis of plaintiff's proposed claim).

Leave to amend must be denied if the amendment would be futile. *Resolution Trust Corp. v. Gold,* 30 F.3d 251, 253 (1st Cir.1994). As Hartford correctly points out, the fact that plaintiff has a claim under 29 U.S.C. § 1132(a)(1) precludes a claim under § 1132(a)(3). *Larocca v. Borden, Inc.,* 276 F.3d 22, 28–29 (1st Cir.2002). That is true even though plaintiff's claim under § 1132(a)(1) proved to be without merit. *See id.* Thus, any claim arising under § 1132(a)(3) would be futile as a matter of law.

The flaw in Hartford's argument is, however, that it has assumed that the basis of plaintiff's proposed claim is an alleged violation of § 1132(a)(3). In fact, it is possible that plaintiff intends to assert a claim under § 1132(a)(2), which explicitly

allows a participant to pursue a claim for breach of fiduciary duty in accordance with § 1109. Because neither the complaint nor plaintiff's memorandum states the statutory basis of his proposed claim (beyond citing "29 U.S.C. § 1001 et seq."), its source remains unclear.

■ Nonetheless, plaintiff's motion has a more serious shortcoming. Once a motion for summary judgment has been filed, a motion for leave to amend will be allowed only if the plaintiff can provide "substantial and convincing evidence" in support of the amendment. *Resolution Trust Corp.*, 30 F.3d at 253. Plaintiff's one-page memorandum falls painfully short of making that showing. Accordingly, his motion will be denied.

Because Fed.R.Civ.P. 15 provides that leave to amend shall be "freely given", however, plaintiff will be accorded the opportunity to re-file his Motion for Leave to Amend to assert a claim for breach of fiduciary duty in light of the concerns raised in this Memorandum. If he should choose to do so, he shall state the *precise* statutory basis of his proposed claim and demonstrate that it would be supported by "substantial and convincing evidence".[4]

## ORDER

In accordance with the foregoing:

1) plaintiff's Motion to Supplement the Record for Judicial Review (Docket No. 32) is **DENIED**;

2) plaintiff's Motion for Oral Argument (Docket No. 39) is **DENIED**;

3) plaintiff's Motion to Determine Appropriate Judicial Standard of Review (Docket No. 45) is **DENIED**;

4) defendant's Motion for Summary Judgment (Docket No. 22) is, with respect to Count I of the complaint and

Count II of the counterclaim, **ALLOWED**, and is, in all other respects, **DENIED**. The Clerk shall enter partial judgment for Hartford with respect to Count II of the counterclaim (breach of contract);

5) plaintiff's Motion for Summary Judgment (Docket No. 27) is **DENIED**; and

6) plaintiff's Motion for Leave to Amend (Docket No. 28) is **DENIED**, without prejudice to re-filing within 21 days of the date of this Order.

**So ordered.**

---

**4.** In addition, plaintiff's future filings shall comply with this Court's Local Rules, including L.R. 5.1, which requires memoranda to be double-spaced.